**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

GRAND SUPERCENTER INC.,

     Plaintiff,

  v.

BUMBLE BEE FOODS LLC, STARKIST
COMPANY, DONGWON INDUSTRIES
CO. LTD, TRI-UNION SEAFOODS LLC
d/b/a CHICKEN OF THE SEA
INTERNATIONAL, INC., and THAI
UNION GROUP PCL,

     Defendants.

17-cv-7244

Case No. _____

**COMPLAINT
JURY TRIAL DEMANDED**

Grand Supercenter Inc. ("Plaintiff" or "Grand Supercenter"), through its attorneys, files this Complaint asserting antitrust claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, against Bumble Bee Foods LLC ("Bumble Bee"), StarKist Company ("StarKist"), Dongwon Industries Co. LTD ("Dongwon"), Tri-Union Seafoods LLC d/b/a Chicken of the Sea International, Inc. ("Chicken of the Sea"), and Thai Union Group PCL (f/k/a Thai Union Frozen Products PCL) ("Thai Union") (collectively, "Defendants"). Plaintiff makes its allegations upon knowledge and otherwise on information and belief. Information in Defendants' custody and control will provide evidence supporting the allegations made on information and belief.

## NATURE OF THE ACTION

1.        Defendants have cornered the shelf-stable tuna market, accounting for approximately 80% of the supply. Defendants agreed to fix, raise, and maintain the price at which they each sold shelf-stable tuna, which Plaintiff directly purchased from one or more of them. The conspiracy began no later than the start of 2011 and continued through at least the end of 2013 (the "Relevant Period").

2.        The existence of Defendants' antitrust price fixing conspiracy is well supported. A federal criminal antitrust investigation into the alleged conspiracy appears to have been prompted by Thai Union's proposed acquisition of Bumble Bee.  Specifically, on July 17, 2015, Thai Union announced its intent to acquire Bumble Bee for $1.5 billion. On July 23, Thai Union confirmed that the DOJ had launched an antitrust investigation into price fixing.  A Global Competition Review article reported that Thai Union's Chairman, Kraisorn Chansiri, stated that Chicken of the Sea, a subsidiary of Thai Union, had received a subpoena "requiring [Chicken of the Sea] to provide relevant information to the DOJ in relation to an antitrust investigation of the packaged seafood industry in the United States." Also on July 23, Bumble Bee acknowledged receipt of a grand jury subpoena,

stating that "[t]he Company did receive a grand jury subpoena relating to a US Department of Justice investigation into potential antitrust violations in the packaged seafood industry." On December 3, 2015, Thai Union and Bumble Bee notified the DOJ that they would not proceed with the proposed acquisition.  The decision to cancel the acquisition of Bumble Bee was based on concerns regarding the ongoing antitrust investigation and potential liability for anticompetitive behavior. Assistant Attorney General William Baer, of the DOJ's Antitrust Division, commented: "Our investigation convinced us—and the parties knew or should have known from the get go—that the market is not functioning competitively today, and further consolidation would only make things worse."

3.      The investigation remains ongoing but has already resulted in the criminal pleas of two Bumble Bee executives, Kenneth Worsham and Walter Scott Cameron. Specifically, they both pled guilty to entering into and engaging in a combination and conspiracy to fix, raise, and maintain the prices of shelf-stable tuna. Defendant Bumble Bee has done the same.

4.      Worsham's December 19, 2016 plea agreement contains the following "true and undisputed" facts:

(a) For purposes of this Plea Agreement, the "relevant period" is that period from at least 2011 through at least 2013. During the relevant period, the defendant was the Senior Vice President of Trade Marketing of Company A, an unindicted coconspirator company, an entity organized and existing under the laws of Delaware and with its principal place of business in San Diego, California. During the relevant period, Company A was a producer of packaged seafood and was engaged in the sale of packaged seafood in the United States. Packaged seafood includes shelf-stable tuna fish. During the relevant period, Company A's sales of packaged seafood affecting U.S. customers totaled at least $300 million.

(b) During the relevant period, the defendant participated in a conspiracy with other persons and entities engaged in the manufacture and sale of packaged seafood, the primary purpose of which was to fix, raise, and maintain the prices of packaged seafood sold in the United States. In furtherance of the conspiracy, the defendant engaged in conversations and discussions and attended meetings with representatives of other major packaged-seafood-producing firms. During these conversations, discussions, and meetings, agreements and mutual understandings were reached to fix,

3

raise, and maintain the prices of packaged seafood sold in the United States.

(c) During the relevant period, packaged seafood sold by one or more of the conspirator firms, and equipment and supplies necessary to the production and distribution of packaged seafood, as well as payments for packaged seafood, traveled in interstate commerce. The business activities of Company A and coconspirators in connection with the production and sale of packaged seafood that were the subject of this conspiracy were within the flow of, and substantially affected, interstate trade and commerce.

5.      Cameron's November 7, 2016 plea agreement was virtually identical.

6.      On May 8, 2017, the DOJ announced that Bumble Bee also agreed to plead guilty:

Bumble Bee Foods LLC has agreed to plead guilty for its role in a conspiracy to fix the prices of shelf-stable tuna fish, such as canned and pouch tuna, sold in the United States, the Department of Justice announced.

According to a one-count felony charge filed today in the U.S. District Court for the Northern District of California in San Francisco, Bumble Bee and its co-conspirators agreed to fix the prices of shelf-stable tuna fish from as early as the first quarter of 2011 through at least as late as the fourth quarter of 2013. In addition to agreeing to plead guilty, Bumble Bee has agreed to pay a $25 million criminal fine, which will increase to a maximum criminal fine of $81.5 million, payable by a related entity, in the event of a sale of Bumble Bee subject to certain terms and conditions. Bumble Bee has also agreed to cooperate with the Antitrust Division's ongoing investigation. The plea agreement is subject to court approval.

"Today's charge is the third to be filed – and the first to be filed against a corporate defendant – in the Antitrust Division's ongoing investigation into price fixing among some of the largest suppliers of packaged seafood," said Acting Assistant Attorney General Andrew Finch of the Justice Department's Antitrust Division. "The division, along with our law enforcement colleagues, will continue to hold these companies and their executives accountable for conduct that targeted a staple in American households."

"We echo the Department of Justice Antitrust Division's sentiment," said Special Agent in Charge John F. Bennett of the FBI's San Francisco Division. "Companies small and large hold a great deal of the American peoples' trust and this type of unfair, greedy behavior will not be tolerated."

7.      On June 28, 2017, Stephen L. Hodge, a former executive at StarKist, also entered

into a plea agreement, which contained the following "true and undisputed" facts:

(a) For purposes of this Plea Agreement, the "relevant period" is that period from at least 2011 through at least 2013. During the relevant period, the defendant was the Senior Vice President of Sales of Company B. During the relevant period, Company B was a producer of packaged seafood and was engaged in the sale of packaged seafood in the United States. Packaged seafood includes shelf-stable tuna fish. During the relevant period, Company B's sales of packaged seafood affecting U.S. customers totaled at least $600 million.

(b) During the relevant period, the defendant participated in a conspiracy with other persons and entities engaged in the manufacture and sale of packaged seafood, the primary purpose of which was to fix, raise, and maintain the prices of packaged seafood sold in the United States. In furtherance of the conspiracy, the defendant engaged in conversations and discussions and attended meetings with representatives of other major packaged-seafood-producing firms. During these conversations, discussions, and meetings, agreements and mutual understandings were reached to fix, raise, and maintain the prices of packaged seafood sold in the United States.

(c) During the relevant period, packaged seafood sold by one or more of the conspirator firms, and equipment and supplies necessary to the production and distribution of packaged seafood, as well as payments for packaged seafood, traveled in interstate commerce. The business activities of the conspirators in connection with the production and sale of packaged seafood that were the subject of this conspiracy were within the flow of, and substantially affected, interstate trade and commerce.

8.      These guilty pleas establish that a conspiracy did exist.  But a guilty plea merely establishes the minimum parameters of a conspiracy.  *See, e.g.*, *In re Vitamins Antitrust Litig.*, No. 99-197, 2000 WL 1475705, at *11 (D.D.C. May 9, 2000) ([T]he Court rejects the notion that the guilty pleas . . . foreclose a broader conspiracy.  Guilty pleas are negotiated instruments which take into account not only the culpability of the accused but the Justice Department's resources and other cases requiring the government's attention.").  Thus, the scope of the conspiracy in this antitrust action may be—and likely is—broader than the criminal convictions to date.

9.      News of the conspiracy has permeated the media. For example, Peter Whoriskey published "Three popular tuna brands conspired to fix prices, court records allege" in The Washington Post on May 16, 2017:

Here's the funny thing about canned tuna: Even as Americans lost their taste for the fish and demand dropped steadily for years, the price of a can seemed to hold steady or rise.

For some, it was an economic riddle.

"Given what was happening to demand, the price of tuna should have declined," said Andrew F. Smith, author of "American Tuna: The Rise and Fall of an Improbable Fish."

It didn't.

Now, there's a new theory for the price of tuna. According to a lawsuit filed by one of the nation's largest retailers, the price of tuna was held aloft because executives at the nation's three largest tuna brands — Bumble Bee, Starkist and Chicken of the Sea — were colluding to fix prices.

Citing email, industry conferences and phone calls, attorneys for Walmart allege that the tuna brands set the price of tuna in order to defy economic forces that ordinarily would have pushed prices down.

Last week, in a related criminal case filed by the Justice Department, Bumble Bee Foods pleaded guilty to conspiring to fix prices sold in the United States between 2011 and 2013. The firm has agreed to pay a $25 million fine.

In addition, two Bumble Bee senior vice presidents, Ken Worsham and Walter Scott Cameron, pleaded guilty to fixing prices. They agreed to cooperate with federal authorities in the ongoing criminal investigation.

The Walmart lawsuit alleges a much broader and longer-lasting conspiracy among the three tuna brands. None of the three answered invitations to comment.

"We believe there is strong evidence that suppliers of canned tuna to Walmart conspired to artificially inflate and wrongfully fix prices in order to increase their own profits at the expense of consumers," said Randy Hargrove, a spokesman for Walmart.

In Walmart's view, laid out in court documents, the conspiracy among the three companies, which control about 80 percent of the U.S. market, began by 2010, at the latest, and lasted through July 2015. During that period, Walmart alleges it was overcharged by the tuna companies.

"Senior executives met at least twice annually and regularly discussed prices and shared sensitive customer information," according to the Walmart lawsuit. Walmart also alleged that the tuna companies agreed to spurn aggressive sales tactics — that is, they weren't going to compete too hard.

In the past, industry officials have described the steady or rising price of tuna as the result of scarce supply. And indeed, the wholesale price of the fish has fluctuated. But according to the May 2015 Food Outlook of the United Nations Food & Agriculture Organization tuna prices had dropped considerably in 2014: "tuna prices declined significantly due to excess supply, with frozen skipjack prices hitting a 6-year low."

Yet, according to Walmart, "despite changes in supply and demand that should have led to lower prices, [Walmart] continued to pay higher prices for packaged tuna products."

But the extent of the alleged collusion, according to Walmart, extended beyond price-fixing. According to the lawsuit, the tuna companies sought to resist pressure from environmental groups such as Greenpeace. Those groups were pushing to outlaw fishing methods that ensnare other animals besides the tuna, including endangered sea turtles and sharks.

"Executives from Bumble Bee, Chicken of the Sea, and StarKist were concerned that a switch to a more sustainable method of fishing would decrease supply and put pressure on their margins," according to the lawsuit.

Citing emails, the Walmart attorneys said that the companies agreed in February 2012 not to sell tuna branded as "FAD-free" or free of the devices blamed for the excessive taking of sea creatures.

The lawsuit comes as the canned tuna industry continues to decline as an American staple. Some of its fall is blamed on Americans turning to fresh fish; some of it was fear of mercury in tuna; other seafoods have become more popular.

Whatever the cause, without tuna's slide in popularity, the collusion and its discovery might never have happened.

The shrinking of tuna sales has led to a series of mergers, and it was one such merger that helped spur the interest of federal prosecutors. In December 2014, Thai Union, the owner of the Chicken of the Sea brand, announced it would acquire Bumble Bee for $1.5 billion. A year later, Thai Union suspended the proposal after announcing that federal investigators had begun an antitrust investigation into the industry.

The troubles in the industry also led the big brands to work together, creating a setting that Walmart attorneys suggest was ripe for collusion. In 2011, the three brands, as part of the Tuna Council, paid for an advertising campaign to revive American interest in canned tuna.

"Tuna the Wonderfish," was the name of the campaign. That didn't work either.

In 1990, per capita consumption of canned tuna was 3.9 pounds and by 2011, it was 2.6 pounds. And despite the campaign, it kept declining. By 2013, the figure had dropped to 2.3 pounds.

10.     During the Relevant Period, Plaintiff purchased shelf-stable tuna that was sold by H Mart, Inc. and its subsidiaries ("H Mart"), a grocer with stores across the country. Plaintiff purchased shelf-stable tuna directly from Defendants and/or their affiliates and agents.  As a result of Defendants' unlawful conspiracy, Plaintiff was overcharged by Defendants. Accordingly, Plaintiff seeks overcharge damages, as well as treble damages and other appropriate relief.

## JURISDICTION AND VENUE

11.     This action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, for costs of the suit and treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

12.     This Court has subject matter jurisdiction over each claim in this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 4 of the Clayton Act, 15 U.S.C. §15(a).

13.     Venue is proper in this District pursuant to Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15, 22; 28 U.S.C. § 1391, because, during the Relevant Period, one or more Defendants transacted business in, was found in, and/or had agents within this District, and a substantial part of the events giving rise to Plaintiff's claims occurred and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

14.     The Court has personal jurisdiction over each Defendant because each Defendant transacted business in this District, directly or indirectly sold packaged seafood products to Plaintiff in this District, has substantial aggregate contacts with this District, and engaged in the alleged price fixing conspiracy directed to purchasers of shelf-stable tuna in this District, including Plaintiff.

## PARTIES

15.     Grand Supercenter is a New York corporation with its principal place of

business in Lyndhurst, New Jersey. Plaintiff directly purchased shelf-stable tuna from Dongwon/StarKist during the conspiracy. Plaintiff is a subsidiary of H Mart, Inc. and purchased the shelf-stable tuna to sell in H Mart stores. H Mart operates over 55 stores in locations throughout the United States, including California, Georgia, Illinois, Maryland, Massachusetts, Michigan, New Jersey, New York, North Carolina, Pennsylvania, Virginia, and Texas.

16.     Grand Supercenter is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C §§ 15(a), 26.

17.     Bumble Bee is a Delaware limited liability company with its headquarters and principal place of business in San Diego, California.  Bumble Bee is defined to include its officers, employees, and any agents acting on its behalf.  During the Relevant Period, Bumble Bee was a leading producer and seller of shelf-stable tuna in the United States. Bumble Bee had approximately 25% market share in the shelf-stable tuna market. Bumble Bee directly participated in the unlawful conduct alleged in this Complaint, in violation of Section 1 of the Sherman Act.

18.     StarKist is a Pennsylvania corporation with its headquarters and principal place of business in Pittsburgh, Pennsylvania.  StarKist is defined to include its officers, employees, and all agents acting on its behalf.  In 2008, Dongwon purchased StarKist and StarKist operated as a wholly-owned subsidiary of Dongwon during the Relevant Period. During the Relevant Period, StarKist was a leading producer and seller of shelf-stable tuna in the United States. StarKist had approximately 35% market share in the shelf-stable tuna market. StarKist, directly or on behalf of Dongwon, directly participated in the unlawful conduct alleged in this Complaint, in violation of Section 1 of the Sherman Act.

19.     Dongwon is a corporation based in Seoul, South Korea. Dongwon sells a

substantial volume of shelf-stable tuna in the United States, and according to its quarterly and annual reports, it typically derives more than 50% of its global revenue from the United States. Dongwon directly participated in the unlawful conduct alleged and/or used its dominance or control over StarKist to conspire with the other Defendants and their co-conspirators in violation of Section 1 of the Sherman Act.

20.     Dongwon is what is known in South Korea as a "chaebol." *See* David Hundt, Korea's Developmental Alliance: State, Capital and the Politics of Rapid Development (2009); R. M. Steers, K.S. Yoo, & G. Ungson, The Chaebol: Korea's New Industrial Might (1989).  Chaebols are closely-knit business groups under the control of a single family or extended family, with key flagship firms that control other firms within the group.  They have four key features: (1) the governance structure of the group involves family or extended family control; (2) the formal organizational structure of the group involves a group headquarters, located in an actual or de facto holding company, sometimes known as a "flagship" company, which controls a network of subsidiaries that fall under the control of the family, the group as a whole, and of flagship firms within the group; (3) the business structure of the firm encompasses a number of discrete products and services, some of which are wholly unrelated and others that are effectively vertically integrated; and (4) strong internal cultures of hierarchy, familism, and loyalty, with family members of the founder or his cohorts occupying key managerial positions within the group.

21.     The Dongwon family of companies fits this definition.  The company started in 1969 and is dominated by Chairman Jae-chul Kim ("Chairman Kim") and members of his family or extended family.  The group headquarters is in Seoul, South Korea, where its holding company, Dongwon Enterprises, is located.  Through its subsidiaries, it operates in a number of business sectors including, among others, marine products, other food products, feed products and pet food, packing

materials, and aluminum foil products.  As explained below, the Dongwon family of companies has an internal culture of hierarchy, familism, and loyalty. Defendants Dongwon and Starkist exhibit that culture with members Kim's family being put in key positions in both companies and executives at Dongwon, Dongwon Enterprises, and various other Dongwon subsidiaries being routinely seconded to StarKist to fill managerial roles.  Dongwon, run by Chairman Kim, is the parent entity for StarKist, but his control over the Dongwon family of companies was such that, upon information and belief, he commanded executives of the holding company or from sister subsidiary companies to either oversee the business of StarKist from Korea or relocate in the United States and help run StarKist. This was done without regard for which Dongwon subsidiary the individual worked for. For the purposes of involvement in StarKist's management, all Dongwon personnel were functionally Dongwon Industries personnel subject to the direct control of Chairman Kim. In other words, as a chaebol, Dongwon does not follow the principles of corporate separateness that are expected of companies incorporated in the United States and instead acts as a single integrated enterprise. Accordingly, acts taken by employees of Dongwon's corporate affiliates in furtherance of the conspiracy, as alleged in detail below, were taken on behalf of the interests of the chaebol and under the control of Dongwon (and Chairman Kim) as the chaebol's flagship.

22.     Upon information and belief, Dongwon directly participated in the conspiracy alleged and purposefully directed its conduct at the United States (including the forum State); produced and sold shelf-stable tuna in the United States and its territories; intentionally sold price-fixed shelf-stable tuna to Plaintiff and others in the United States; used its dominance or control of StarKist's raw material purchasing and tuna business to conspire with the other Defendants and their co-conspirators; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

23.     Alternatively, upon information and belief, during the Relevant Period, Dongwon participated in the conspiracy by and through StarKist, which acted as Dongwon's alter ego or agent. Dongwon dominated or controlled StarKist's canned tuna business as reflected by, among other actions, Dongwon's domination or control of StarKist's production, pricing, hiring, budgeting, capitalization, and/or marketing of canned tuna. During this time period, Dongwon effectively controlled and took over performance of the day-to-day operations of StarKist's canned tuna business, and there was such unity of interest and ownership between Dongwon and StarKist that the individuality or separateness of the two companies ceased with respect to StarKist's canned tuna business.

24.     StarKist's status as the alter ego or agent of Dongwon is evidenced by the following facts:

(a)     Dongwon owned 100% of Starkist and used it as a mere shell, instrumentality, or conduit for a single venture involving the marketing and sale of price-fixed tuna in the United States caught, processed, and/or packaged by Dongwon in South Korea and Thailand for the ultimate benefit of Dongwon and the Kim family. StarKist enabled Dongwon to be vertically integrated with respect to its U.S. operations. As a result, Dongwon and StarKist effectively functioned as a single entity for purposes of the conspiracy. With respect to the shelf-stable tuna produced by Dongwon in South Korea and Thailand and sold in the United States, StarKist merely acted as Dongwon's marketing conduit to sell Dongwon's canned tuna under the Dongwon-owned StarKist label.

(b)     Dongwon dominated or controlled StarKist's marketing of canned tuna in the United States.  As Dongwon's website states,  "StarKist is an iconic tuna brand in the United States, and has been controlled by Dongwon Group since 2008, accompanying Dongwon Group on

its journey to globalization . . . . Through the acquisition of StarKist, Dongwon Group has secured an opportunity to take off as the world's biggest tuna company, and will become de facto a globalized enterprise." Dongwon has presented a common global marketing image with StarKist. As Dongwon stated in 2008, it acquired StarKist to "establish a strong foothold in penetrating the U.S. market" and "to add a stable buyer of its tuna and to place other products in the U.S. through StarKist's distribution network." Dongwon and StarKist presented themselves to Plaintiff as a single, vertically integrated entity. StarKist's website states that "Dongwon Industries is one of the world's largest tuna catching companies with a fleet of 36 boats. Dongwon's world class fish procurement and processing capacity builds on StarKist's national brand recognition and distribution networks in the United States to bring world-class seafood to consumers worldwide."

(c)     Dongwon and StarKist used the same offices or locations in the United States. Dongwon's website lists StarKist's U.S. office as one of its global branch offices.

(d)     Dongwon and StarKist had overlapping Board Members and key executives who dominated or controlled StarKist. For example, and without limitation, in about September 2014, Andrew Choe ("A. Choe") became the President and CEO of StarKist. A. Choe was seconded to StarKist in April 2012 as the Senior Vice-President of its supply chain. Previously, A. Choe had held an executive position at Dongwon as Director of Strategic Planning. Nam-Jung Kim ("NJ Kim"), son of Chairman Kim, served as the COO of StarKist from about 2012 until October 2014, when he was promoted to Vice Chairman of StarKist. He currently serves on the Board of Directors for StarKist and Dongwon. Prior to his being sent to join StarKist, NJ Kim was Vice President of Dongwon F&B (a Dongwon subsidiary) and Dongwon Enterprise Co. (the Kim family's holding company). Since 2008, NJ Kim has served as the Head of the Finance and Planning Department at Dongwon Systems and served as Vice President of its construction unit. Additionally, according to Forbes, in

13

preparation for Chairman Kim's succession, "the founder has been transferring ownership of the private family holding company, Dongwon Enterprise Co., which owns stakes in [Dongwon and other affiliates], to Nam-Jung. Jae-Chul holds a 24.5% stake and Nam-Jung, 68%." Accordingly, NJ Kim owned a controlling interest in Dongwon while serving as StarKist's COO and Vice Chairman. The position of COO was created specifically for him, so that he could lead the "continued growth and expansion of Dongwon-StarKist global business." Also, Hyung-Joo Kim, Chief Financial Officer ("CFO") of Dongwon F&B, was seconded to StarKist in 2012 to serve as CFO. In-Gu Park ("IG Park"), the Chairman of the Board of StarKist, also served as its Acting President from November 2010 to March 2011. IG Park serves as CEO of Dongwon Precision Machinery Company and has also served as CEO and Vice Chairman at Dongwon F&B and Dongwon Enterprise. During the Relevant Period, IG Park chaired StarKist's Board of Directors while simultaneously sitting on the Board or serving as an Officer (or both) of other Dongwon companies. Additionally, StarKist's board meetings were often held in South Korea so that Dongwon executives could easily attend them.

       (e)     Dongwon appointed people who were involved in the day-to-day operations of StarKist, including people who participated in the conspiracy as Dongwon intended. For instance, and without limitation, Dongwon appointed senior executives at StarKist, including at least In-Soo Cho, A. Choe, and Sam Lee. Additionally, Dongwon dismissed several StarKist executives in 2012 and replaced them with employees from within the Dongwon corporate family, including Hyung-Joo Kim as CFO. After Dongwon's acquisition of StarKist, American executives at StarKist Company began to leave, voluntarily and involuntarily. One report indicated that a "plethora of executives from Dongwon Industries' Seoul headquarters . . . complete with translators" had "descend[ed] on Pittsburgh to sort out the 'challenges' the company is going through." A source stated that "there is so much American management leaving and probably even more so after this announcement[.]"

(f)     Due to the unlawful conduct alleged in this Complaint, StarKist earned profits in excess of what it would have earned in a competitive market. Accordingly, Dongwon knowingly profited from StarKist's participation in the conspiracy and knowingly accepted the proceeds of the conspiracy and has been unjustly enriched. As a result, adherence to the fiction of the separate existence of Dongwon and StarKist would sanction a fraud or promote an injustice, and an inequitable result or an injustice would occur if the corporate form were elevated over substance.

25.     Chicken of the Sea is a corporation organized, existing, and doing business under the laws of the State of California, with its headquarters and principal place of business in San Diego, California.  Chicken of the Sea is defined to include its officers, employees, and any agents acting on its behalf.  In 1997, Tri-Union Foods LLC acquired Chicken of the Sea (then called Van Camp Seafood Company), with Thai Union owning a 50% share of the limited liability company. In 2000, Thai Union acquired the remaining 50% share of Tri-Union Foods LLC, and Chicken of the Sea became a wholly owned subsidiary of Thai Union (and remains so to this day). According to estimates, Chicken of the Sea accounted for approximately 20% of the sales of shelf-stable tuna in the United States. Chicken of the Sea directly participated in the unlawful conduct alleged in this Complaint, in violation of Section 1 of the Sherman Act.

26.     Thai Union is a corporation organized, existing, and doing business in Thailand, with its headquarters located in Amphar Muang, Thailand.  After fully acquiring Tri-Union Foods LLC, Thai Union became the full owner of Chicken of the Sea.  Upon information and belief, Thai Union directly participated in the unlawful conduct alleged in this Complaint and/or used its dominance or control over Chicken of the Sea's raw material purchasing and tuna business to conspire with the other Defendants and their co-conspirators in violation of Section 1 of the Sherman

Act.

27.     Upon information and belief, during the Relevant Period, Thai Union directly participated in the conspiracy and purposefully directed this conduct at the United States (including the forum State); produced and sold shelf-stable tuna in the United States and its territories; used its dominance or control of Chicken of the Sea's raw material purchasing and tuna business to conspire with the other Defendants and their co-conspirators; and engaged in the unlawful conduct alleged in this Complaint in violation of Section 1 of the Sherman Act.

28.     Alternatively, upon information and belief, during the Relevant Period, Thai Union participated in the conspiracy by and through Chicken of the Sea, which acted as and was Thai Union's alter ego or agent. Thai Union dominated or controlled Chicken of the Sea's shelf-stable tuna business as reflected by, among other actions, Thai Union's domination or control of Chicken of the Sea's production, pricing, hiring, budgeting, capitalization, and/or marketing of canned tuna. During the Relevant Period, Thai Union effectively controlled and took over performance of the day-to-day operations of Chicken of the Sea's canned tuna business, and there was such unity of interest and ownership between Thai Union and Chicken of the Sea that the individuality or separateness of the two companies ceased with respect to Chicken of the Sea's shelf-stable tuna business.

29.     Chicken of the Sea's status as the alter ego or agent of Thai Union is evidenced by the following facts:

(a)     Thai Union used Chicken of the Sea as a mere shell, instrumentality, or conduit for a single venture involving the sale of price-fixed shelf-stable tuna in the United States caught, processed, and canned or pouched by Thai Union in Thailand for the ultimate benefit of Thai Union.  Chicken of the Sea enabled Thai Union to be vertically integrated with respect to the U.S. operations.  As a result of this structure, Thai Union and Chicken of the Sea effectively functioned as

a single entity for purposes of the conspiracy.  In the words of Thai Union, Chicken of the Sea and Thai Union were not just "family," but "Thai Union + COSI = One Company."  With respect to the shelf-stable tuna produced by Thai Union in Thailand and sold in the United States, Chicken of the Sea merely acted as Thai Union's marketing conduit to sell Thai Union's shelf-stable tuna under the Thai Union-owned Chicken of the Sea label.  This comes as no surprise because Thai Union's website demonstrates that Thai Union views Chicken of the Sea as part of Thai Union's overall "Global Tuna Business" and "US Ambient Operations" controlled directly by Thai Union's Board of Directors and executives:



(b)       Thai Union dominated or controlled Chicken of the Sea's marketing of shelf-stable tuna in the United States.  For example, Thai Union presented a common global marketing image with Chicken of the Sea.  Thai Union's 2015 Annual Report lists Chicken of the Sea as "our strong brand in North America."  Thai Union's 2001 Annual report stated,  "[t]he principal activities

of the overseas subsidiaries such as the subsidiaries in United States are the manufacture and distribution of canned seafood, and the import of shrimp and other frozen seafood products for sale to restaurant chains, retailing, wholesaling and food processing."

      (c)      Thai Union and Chicken of the Sea used the same offices or locations in the United States.  Thai Union's 2015 Annual Report, identifying "Thai Union's footprint," lists itself as having corporate offices in Portsmouth, New Hampshire; New York, New York; El Segundo, California; San Diego, California; and Lyons, Georgia.  Each of these locations is an office or plant of Chicken of the Sea.

      (d)      Thai Union and Chicken of the Sea had overlapping Board Members and key Thai Union executives dominated or controlled Chicken of the Sea. For example, according to a corporate organizational chart on its website, Thai Union represents that it treats Chicken of the Sea as part of its overall "Global Tuna Business" and "US Ambient Operations" that are controlled directly by Thai Union's Board of Directors and executives. Kraisorn Chansiri, the Chairman of Thai Union, is a member of the Board of Directors of Chicken of the Sea; Cheng Niruttinanon, Executive Chairman of Thai Union, is a member of Chicken of the Sea's Board of Directors; and Thiraphong Chansiri, President and CEO of Thai Union, is a member of Chicken of the Sea's Board of Directors and President of Thai Union North America, Inc., a wholly-owned subsidiary of Thai Union and the holding company through which Thai Union owns Chicken of the Sea and does business in the United States. Additionally, Shue Wing Chan, a member of the family that controls Thai Union and a member of Thai Union's self-styled "Global Leadership Team," is President and CEO of Chicken of the Sea. David Roszmann, the former COO of Chicken of the Sea, joined Chicken of the Sea in March 2013 and directly reported to CEO Chan on matters including sales, marketing, procurement, supply chain, operations, finance, HR, legal and IT. Roszmann left Chicken of the Sea in December

2015, soon after the DOJ questioned Thai Union's attempt to acquire Bumble Bee. Chan now holds executive positions at Chicken of the Sea and other subsidiaries controlled by Thai Union. Further, Chang Tim King served as Executive Director and CFO of Thai Union and a member of the Chicken of the Sea Board of Directors.

(e)     Due to the unlawful conduct alleged in this Complaint, Chicken of the Sea earned profits in excess of what it would have earned in a competitive market. Chicken of the Sea transferred its ill-gotten gains to its parent, Thai Union, by paying out the unlawfully obtained profits and other conspiracy proceeds to Thai Union in the form of dividends and other transfer payments. Accordingly, Thai Union knowingly profited from Chicken of the Sea's participation in the conspiracy and knowingly accepted the proceeds of the conspiracy and has been unjustly enriched. Further, Thai Union charged Chicken of the Sea prices for tuna that were higher than Chicken of the Sea would have paid had Chicken of the Sea been free to acquire tuna at market rates. As a result, adherence to the fiction of the separate existence of Thai Union and Chicken of the Sea would sanction a fraud or promote an injustice, and an inequitable result or an injustice would occur if the corporate form were elevated over substance.

## CO-CONSPIRATORS

30.     On information and belief, other entities and individuals not named as Defendants conspired with Defendants and committed acts in furtherance of the unlawful conspiracy alleged in this Complaint.  Discovery will establish the extent of the alleged conspiracy and the identity of its members.

## TRADE AND COMMERCE

31.     During the Relevant Period, Defendants and their co-conspirators engaged in business that affects or is within the flow of interstate or foreign commerce and the effect of that

19

business on interstate or foreign commerce is substantial.

32.     Defendants and their co-conspirators sold substantial quantities of shelf-stable tuna in a continuous and uninterrupted flow in interstate commerce to customers located in States other than the States in which the Defendants and their co-conspirators produced the tuna, including to Plaintiff in New York and the other states in which it has locations.

33.     In addition, money, data, information, correspondence, and/or financial material were exchanged between Defendants in the State in which each is incorporated or has its principal place of business and other States.

34.     The effect of Defendants and their co-conspirators' anticompetitive conduct on commerce in the United States gives rise to Plaintiff's claims.

## **THE CONSPIRACY**

35.     **Tuna production.**  The production of shelf-stable tuna begins with catching the fish.  Both Dongwon and Thai Union control extensive tuna fishing fleets that are used at least in part to supply tuna to StarKist and Chicken of the Sea, respectively. After it is caught, the tuna is frozen or refrigerated for transport.  The frozen or refrigerated tuna is delivered to a processing plant, where an initial quality control inspection is performed.  The tuna is then thawed and precooked. The fish is then cooled, cleaned, and packaged.

36.     **Increases in supply.**  Technological advances in fishing for tuna over the last 40 years have greatly increased the volume of skipjack tuna caught annually. Skipjack tuna makes up the majority of light grade tuna, which in turn makes up the majority of tuna used in prepackaged tuna products. Most notably, advances in purse seine fishing have dramatically increased the volume of skipjack caught annually. "A purse seine is a large wall of netting deployed around an entire area or school of fish. The seine has floats along the top line with a lead line threaded through rings along the

20

bottom. Once a school of fish is located, a skiff encircles the school with the net. The lead line is then pulled in, 'pursing' the net closed on the bottom, preventing fish from escaping by swimming downward." http://www.nmfs.noaa.gov/pr/interactions /gear/purseseine.htm. Purse seine fishing is responsible for approximately 63% of all tuna caught globally. https://iss-foundation.org/about-tuna/fishing-methods/purse-seine/.

37.    Purse seine fishing and other technological advances have increased efficiencies and substantially lowered the cost necessary to fish for tuna on a commercial scale.  According to the Pacific Islands Forum Fisheries Agency, between 1986 and 2007, the average catch per tuna vessel increased from 3,750 to 7,100 metric tons annually. In addition, the number of tuna fishing vessels in operation increased by more than 25% between 2007 and 2011.

38.    Taken in combination, the increased number of vessels and their increased production has greatly increased the amount of packaging grade tuna caught annually.

39.    **Decreases in demand.**  In addition to increases in supply, the demand for shelf-stable tuna products in the United States has been decreasing.  For example, according to data from the National Oceanic and Atmospheric Administration, per capita canned tuna consumption in the United States dropped from almost 4.0 pounds per year in 1990 to around 2.4 pounds in 2012.

40.    These trends are reflected in the following charts from Roberto A. Ferdman's August 18, 2014 article titled "How America fell out of love with canned tuna," published in The Washington Post:





Canned tuna as a share of total fish and seafood consumption

Made with Chartbuilder                                                     Data: USDA

41. **But prices have not fallen.** In normal competitive economic markets, it is ordinarily the case that increases in supply and decreases in demand will result in lower prices. Put differently, as a result of declining U.S. demand and increasing supply of shelf-stable tuna, market forces should have put substantial downward pressure on prices. That has not been the case in the shelf-stable tuna market because of the alleged price-fixing conspiracy. The artificially inflate prices have resulted in a profit windfall for Defendants.

42. Contrary to the economic forces of supply and demand, the price of canned tuna increased dramatically during the Relevant Period. According to the Food and Agriculture Organization of the United Nations, the price of canned tuna in the United States (per carton) increased from approximately $25 to over $40 between 2011 and 2013.

43. Plaintiff, in particular, paid a higher cost for the shelf-stable tuna products that it

purchased from Defendants during the Relevant Period.

44.     Defendants and their co-conspirators' pricing of prepackaged tuna products sold to Plaintiff and others in the United States is not consistent with the expected pricing of a commodity product for which there is increasing supply and declining demand. Indeed, standard economic forces occurring during the conspiracy would lead one to expect and predict declining prices.

45.     Significantly, price increases during the Relevant Period are not explained by raw material costs, as the cost of tuna at the dock has not been increasing at a similar rate. For example, in its May 2015 Food Outlook biannual report, the United Nations Food & Agriculture Organization noted that tuna prices had dropped considerably in 2014. But the declining cost of tuna was not reflected in the price at which Defendants sold shelf-stable tuna to Plaintiff. The higher prices of shelf-stable tuna products resulted in profits of substantial size for all Defendants.

46.     This trend is reflected in the following chart from Roberto A. Ferdman's August 18, 2014 article titled "How America fell out of love with canned tuna," published in The Washington Post:



47.     **Defendants control the shelf-stable tuna market and there are high barriers to entry.**  According to a May 2012 Bumble Bee presentation, StarKist had 34.6% of the packaged tuna market in the United States, Bumble Bee had 27.8%, and Chicken of the Sea had 19.4%. According to a December 2014 report by the Wall Street Journal, StarKist had 36% of the market, Bumble Bee had 25%, and Chicken of the Sea had 20%.

48.     Defendants share and control a large, profitable market.  In 2014, the Wall Street Journal reported that the market for canned tuna in the United States was approximately $1.7 billion. Given their respective market shares, Defendants each sold hundreds of millions of dollars of shelf-stable tuna annually during the Relevant Period.

49.     High barriers to entry have made it difficult for competitors to penetrate Defendants' price-fixing cartel and erode their market share. For example, any new entrants into the market would be faced with substantial start-up costs, including the need to gain access to distribution

channels and retail outlets, and would require substantial manufacturing expertise to enter the U.S. market.

50.     New entrants would also have to contend with substantial upfront and industry-specific costs to build a processing plant to make prepackaged tuna products.  For example, when Tri-Marine modernized a plant that it acquired from Chicken of the Sea in American Samoa in 2010 the costs exceeded $70 million and the project took five years.

51.     The existence of restrictive tariffs ranging from 6-35% on imported prepackaged tuna products into the United States also impairs the ability of and prevents other foreign suppliers from entering the market.

52.     **Defendants' actions only make sense if they were colluding.** As alleged, the shelf-stable tuna market was controlled by only a few companies. But none of those companies possessed enough market power alone to increase prices to the artificial level seen during the conspiracy. Indeed, because Defendants' canned tuna products were close substitutes, a unilateral attempt by any one of them to manipulate prices or supply was an extremely risky endeavor. For example, if one company raised prices, but others did not follow, that company would lose sales. Thus, Defendants and their co conspirators' actions during the conspiracy would have been against their self-interest unless they were colluding.

53.     **Defendants' illegal conspiracy.**  During the Relevant Period, Defendants and their co-conspirators agreed to fix, raise, and maintain the prices of shelf-stable tuna fish sold to Plaintiff and others in the United States.  This is reflected in the fact that the price of shelf-stable tuna has increased notwithstanding market forces—increasing supply and decreasing demand—putting downward pressure on such prices.  It is similarly reflected in the criminal pleas discussed above.

54.     Defendants and their co-conspirators carried out their conspiracy through in-

26

person meetings and communications including, but not limited to, phone calls and emails. Defendants agreed on pricing and product information. Defendants also agreed on the timing and amount of price increases.

55.      Defendants' control of the shelf-stable tuna market provided them with numerous opportunities to meet and discuss the market and product pricing. For example, Defendants regularly attended the biannual "tuna conference," which was typically held in Thailand and never in the United States. Defendants also met regularly at the National Fisheries Institute ("NFI") Tuna Council and the International Seafood Sustainability Foundation.

56.      The Tuna Council is a trade association within the NFI that meets multiple times per year. StarKist, Chicken of the Sea, and Bumble Bee are the only members of the Tuna Council. During the Relevant Period and in furtherance of the conspiracy, Defendants met and communicated at Tuna Council meetings regarding the pricing of shelf-stable tuna products. Defendants also exchanged confidential information regarding pricing, production, and customers of shelf-stable tuna. For example, in 2011 and 2012, there were communications among senior executives and sales personnel of Bumble Bee, Chicken of the Sea, and StarKist that resulted in an agreement to raise list prices across their lines of tuna products. Pursuant to this agreement, Defendants each raised the price at which they sold shelf-stable tuna products in a coordinated fashion. During at least one telephone conversation between Bumble Bee and StarKist executives, StarKist informed Bumble Bee that StarKist and Chicken of the Sea agreed to raise prices.

57.      In 2011, upon information and belief, Jan Tharp, then Bumble Bee's Senior Vice President of Operations (and a prior StarKist executive), attended a meeting at a hotel with executives from StarKist and Chicken of the Sea. During the meeting, the executives agreed that all three companies would raise prices on shelf-stable tuna products.

27

58.     In December 2011 and January 2012, there were phone conversations between executives of Bumble Bee, Chicken of the Sea, and StarKist that resulted in an agreement to raise list prices across their lines of tuna products.  This agreement resulted in price increases that became effective in March 2012. For example, effective March 27, 2012, Bumble Bee raised the prices on several different items, including canned solid white and chunk light tuna. Shortly thereafter, effective April 1, 2012, StarKist raised prices, including on canned solid white and chunk light tuna, as well as on various pouches and kits.

59.     In addition, in 2011 and 2012, StarKist, Chicken of the Sea, and Bumble Bee jointly sponsored the advertising campaign "Tuna the Wonderfish" with the goal of increasing demand for shelf-stable tuna products.  Joe Tuza, Senior VP of Marketing for StarKist, said that the campaign's effort to increase tuna supply would benefit all three members of the Tuna Council, for "as the water level rises . . . all boats rise with the tide."  Thus, Defendants were amicably coordinating their advertising activities at the same time that they were agreeing to charge supra-competitive pricing.

60.     Defendants and their co-conspirators agreed during the Relevant Period to refrain from engaging in aggressive promotion.  If one company were to aggressively promote a particular product, such promotion could undermine Defendants' agreement to fix the price of such product. This coordinated conduct furthered the conspiracy and its aims by helping to maintain the artificially inflated price at which Defendants, including Dongwon/StarKist, sold shelf-stable tuna products to Plaintiff.

61.     Defendants and their co-conspirators colluded to continue to resist outside pressure from environmental groups to discontinue or curtail the use of fish aggregating devices ("FAD"), which are widely criticized because of the large number of animals (including endangered species) that are ensnared inadvertently. Defendants were concerned that, by switching to more

28

sustainable methods of fishing, there would be a reduction in supply that would put pressure on their price margins.  Accordingly, upon information and belief, in 2011, Defendants began to discuss an agreement not to sell any branded "FAD-free" packaged tuna.  In 2012, Defendants reached such an agreement.

62.     Defendants agreed to take other steps for the purpose of generating profits through the unlawful agreement.  Among the other steps taken by Defendants were agreements to reduce package sizes, to limit promotions and discounts on packaged tuna, to enter into co-packing agreements involving the shared use of packing and canning facilities, and to not accept customer orders exceeding the customer's historical buying pattern.

63.     During the Relevant Period, Plaintiff purchased a variety of shelf-stable tuna products from Defendants, in particular Dongwon/StarKist.  In short, Plaintiff paid more than it otherwise would have for shelf-stable tuna products during the Relevant Period as a result of Defendants' illegal contract, combination, or conspiracy.  This is an antitrust injury of the type the antitrust laws are meant to punish and prevent.

## TOLLING AND STATUTE OF LIMITATIONS

64.     The statutes of limitation as to Defendants and their co-conspirators' continuing antitrust violations were tolled because of one or more of the following events: (1)  the pendency of one or more class action complaints against Defendants and their co-conspirators for conspiring to fix prices of shelf-stable tuna products; (2) the ongoing criminal investigations; (3)  Defendants' affirmative and fraudulent concealment of the conspiracy prevented Plaintiff from having notice of its claims until in or about 2015; (4) Plaintiff had neither actual nor constructive knowledge of the antitrust conspiracy alleged in this Complaint, including the facts constituting its claim for relief, and could not have discovered the alleged conspiracy until in or about 2015; (5) Plaintiff did not know nor

29

could reasonably suspect the existence of its claims because the alleged conspiracy was self-concealing; and (6) Defendants engaged in affirmative acts that concealed the existence of the unlawful conspiracy, including by providing Plaintiff and others in the United States with false or misleading pretexts for Defendants' increases in price for shelf-stable tuna products.

65.     Plaintiff has brought the alleged claims within the applicable limitations period.

## COUNT 1:
## VIOLATION OF THE SHERMAN ACT

66.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

67.     At a time that has yet to be conclusively determined but no later than the beginning of 2011 and continuing at least through the end of 2013, Defendants and co-conspirators engaged in a continuing agreement, understanding, and conspiracy to fix prices in and not to compete with regard to the sale of shelf-stable tuna products within the United States market in an unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

68.     This contract, combination, and conspiracy consisted of an ongoing course, practice, and pattern of conduct relating to the production, pricing, and/or sale of shelf-stable tuna products in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

69.     Defendants and their co-conspirators intended to and did substantially restrain trade.  They shared a conscious commitment to a common scheme designed to achieve the unlawful objective of artificially raising and/or fixing the price of shelf-stable tuna in the United States market.

70.     The conspiracy unreasonably restrained trade.  There is no legitimate business justification for the alleged collusion, the purpose of which was to unlawfully increase profits for the Defendants, and any economic benefit that is lawful could have been achieved through less restrictive

means.

71.     The alleged unlawful conspiracy constitutes a *per se* violation of Section 1 of the Sherman Act.

72.     The antitrust violations of the Defendants and their co-conspirators injured Plaintiff in its business and property in amounts that have yet to be obtained or determined. Plaintiff's injury as a direct purchaser of shelf-stable tuna products is an injury of the type that the antitrust laws were designed to prevent and each injury flows from that which makes Defendants and their co-conspirators' conduct unlawful.  Plaintiff's injuries fall within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court order the following relief:

A.     Adjudge and decree that the alleged contract, combination, and conspiracy is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

B.     Enter joint and several judgments against the Defendants and in favor of Plaintiff;

C.     Award damages in an amount to be determined at trial, including treble the amount of the jury verdict plus interest, in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15;

D.     Award Plaintiff its cost of suit, including reasonable attorneys' fees, as provided by law; and

E.     Any further relief such as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.

Dated: September 22, 2017

Respectfully submitted,

*/s/ Paul B. Maslo*
Paul B. Maslo
Paul J. Napoli
Salvatore C. Badala
NAPOLI SHKOLNIK PLLC
360 Lexington Avenue, 11th Floor
New York, New York 10017
Telephone: (212) 397-1000
Fax: (646) 843-7603
Email:  pmaslo@napolilaw.com
        pnapoli@napolilaw.com
        sbadala@napolilaw.com

*Counsel for Plaintiff*